ACCEPTED
01-14-00982-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
10/14/2015 5:36:45 PM
CHRISTOPHER PRINE
CLERK

**No. 01-14-00982-CR**

In the

Court of Appeals

For the

First District of Texas

At Houston

———————◆———————

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

10/14/2015 5:36:45 PM

CHRISTOPHER A. PRINE
Clerk

**No. 1338054**

In the 338th District Court

Of Harris County, Texas

———————◆———————

**JUAN BARRERA-MAGANA**

*Appellant*

V.

**THE STATE OF TEXAS**

*Appellee*

———————◆———————

STATE'S APPELLATE BRIEF

———————◆———————

**DEVON ANDERSON**
District Attorney
Harris County, Texas

**AARON BURDETTE**
**SHANNON DREHNER**
Assistant District Attorneys
Harris County, Texas

**PATRICIA MCLEAN**
Assistant District Attorney
Harris County, Texas
mclean_patricia@dao.hctx.net

1201 Franklin, Suite 600
Houston, Texas 77002
Tel.: 713-755-5826
FAX No.: 713-755-5809

*Counsel for Appellee*

ORAL ARGUMENT CONDITIONALLY WAIVED

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to TEX. R. APP. P. 39.1, the State waives oral argument because the briefs in this case adequately address the issues of fact and law to the Court. However, should the Court desire oral argument, the State requests oral argument.

# IDENTIFICATION OF THE PARTIES

Counsel for the State:

**Devon Anderson**—District Attorney of Harris County

**Aaron Burdette**—Assistant District Attorney at trial

**Shannon Drehner**—Assistant District Attorney at trial

**Patricia McLean**—Assistant District Attorney on appeal


Appellant:

**Juan Barrera-Magana**


Counsel for Appellant:

**Alexis Bruegger**—Defense counsel at trial

**Jill Lansden**—Defense counsel at trial

**Vivian King**—Defense counsel on appeal


Trial Judge:

**Honorable Brock Thomas**

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ............................................................i

IDENTIFICATION OF THE PARTIES ................................................................... ii

INDEX OF AUTHORITIES ..................................................................................v

STATEMENT OF THE CASE...............................................................................1

STATEMENT OF FACTS ....................................................................................1

    I.   Initial investigation ................................................................................1
    II. Margarita Gonzales's testimony ........................................................3
    III.   Minerva Gonzales's testimony ........................................................3
    IV.   Daniel Torres's testimony ................................................................4
    V. Francisco Velasquez's testimony ........................................................9
    VI.   William Navarrete's testimony..........................................................12
    VII. Concepcion Benavides's testimony ..................................................12
    VIII. Follow-up investigation..................................................................15

SUMMARY OF THE ARGUMENT .....................................................................17

RESPONSE TO APPELLANT'S THIRD POINT OF ERROR............................18

    I.   Corroboration of accomplice witness testimony........................................18
    II. The non-accomplice evidence presented at trial corroborates Torres's
    accomplice witness testimony. ..................................................................21

RESPONSE TO APPELLANT'S FIRST AND SECOND POINTS OF ERROR ..24

    I.   Standard of review........................................................................24
    II. Sufficiency of evidence regarding the law of parties...............................26
    III.   The evidence presented is sufficient to uphold appellant's murder
    conviction as the principal actor or as a party to the offense. ..............27

CONCLUSION .................................................................................................29

CERTIFICATE OF SERVICE ..........................................................................30

CERTIFICATE OF COMPLIANCE ........................................................................30

# INDEX OF AUTHORITIES

**CASES**

*Aston v. State*,
656 S.W.2d 453 (Tex. Crim. App. 1983)...........................................................20

*Bingham v. State*,
913 S.W.2d 208 (Tex. Crim. App. 1995) (op. on reh'g) ............................... 20, 22

*Brooks v. State*,
323 S.W.3d 893 (Tex. Crim. App. 2010)............................................................24

*Cain v. State*,
958 S.W.2d 404 (Tex. Crim. App. 1997).............................................................25

*Clay v. State*,
240 S.W.3d 895 (Tex. Crim. App. 2007)........................................................ 23, 28

*Clayton v. State*,
235 S.W.3d 772 (Tex. Crim. App. 2007)........................................................ 22, 25

*Connor v. State*,
67 S.W.3d 192 (Tex. Crim. App. 2001)...............................................................26

*Cordova v. State*,
698 S.W.2d 107 (Tex. Crim. App. 1985).............................................................26

*Crawford v. State*,
863 S.W.2d 152 (Tex. App.—Houston [1st Dist.] 1993, *rev'd*, 892 S.W.2d 1
(Tex. Crim. App. 1994) ....................................................................................20

*Dowthitt v. State*,
931 S.W.2d 244 (Tex. Crim. App. 1996)........................................................ 19, 21

*Gill v. State*,
873 S.W.2d 45 (Tex. Crim. App. 1994)...............................................................19

*Guevara v. State*,
152 S.W.3d 45 (Tex. Crim. App. 2004)...............................................................26

*Hooper v. State*,
214 S.W.3d 9 (Tex. Crim. App. 2007)................................................................25

*Jackson v. Virginia*,
443 U.S. 307 (1979) ........................................................................... 25, 26

*Matson v. State*,
819 S.W.2d 839 (Tex. Crim. App. 1991)............................................................25

*McDuff v. State*,
939 S.W.2d 607 (Tex. Crim. App. 1997)...................................................... 19, 23

*Miller v. State*,
177 S.W.3d 177 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) ............. 23, 28

*Moreno v. State*,
755 S.W.2d 866 (Tex. Crim. App. 1988)............................................................25

*Nguyen v. State*,
177 S.W.3d 659 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) ............. 21, 22

*Noland v. State*,
264 S.W.3d 144 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) ...................25

*Reynolds v. State*,
489 S.W.2d 866 (Tex. Crim. App. 1972)............................................................20

*Robles v. State*,
104 S.W.3d 649 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ........................25

*Smith v. State*,
332 S.W.3d 425 (Tex. Crim. App. 2011)............................................... 19, 20, 24

*Sorto v. State*,
173 S.W.3d 469 (Tex. Crim. App. 2005)............................................................26

*Thompson v. State*,
697 S.W.2d 413 (Tex. Crim. App. 1985)............................................................26

*Torres v. State*,
794 S.W.2d 596 (Tex. App.—Austin 1990, no pet.) .................................... 23, 28

**STATUTES**

TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2015)..........................................18

**RULES**

TEX. R. APP. P. 39.1................................................................................ i

**OTHER**

*Black's Law Dictionary*, (6th ed. 1990) ....................................................20

Ray, Texas Practice Vol. 2, *Law of Evidence*, §1538 (1980) ....................................23

**TO THE HONORABLE COURT OF APPEALS:**

## STATEMENT OF THE CASE

Appellant was charged by indictment with murder. (C.R. at 10) Appellant was found guilty of murder and sentenced by a jury to life in the Texas Department of Criminal Justice, Institutional Division, and a $10,000 fine. (C.R. at 127-28) The court also made an affirmative deadly-weapon special finding. (C.R. at 127-28) Appellant timely filed notice of his intent to appeal and the trial court certified his right of appeal. (C.R. at 126, 130-31)

## STATEMENT OF FACTS

### I.    Initial investigation

In the morning hours of November 15, 2004, the complainant was found dead near a park and his home in Old Baytown. (3 R.R. at 20-21, 25-28, 36-37, 39-41; State's Exhibit 1) The complainant was shot three times and cause of death was due to multiple gunshot wounds. (3 R.R. at 84; 4 R.R. at 6, 9-10, 16-20; State's Exhibit 31) Three spent 9-mm shell casings were found at the scene near the complainant's body but no bullets or projectiles were found. (3 R.R. at 60-67; *see* 3 R.R. at 41) No weapon was found on the complainant and, per former Baytown Police Department (BPD) Officer Craft, no one reported seeing the complainant fire a weapon or become involved in a disturbance. (3 R.R. at 106)

BPD Officer White did not search for casings or bullets in areas other than where the complainant's body was found and did not try to locate surveillance video that might have been present at a school near the scene. (3 R.R. at 77-78) However, Officer Craft testified no cameras were found in the area and there was no indication there were cameras at the school that could have captured the incident. (3 R.R. at 104-105)

Former BPD Officer Widner found no eyewitnesses. (3 R.R. at 79, 82-83) Officer Widner testified most everyone at the scene knew the complainant and were not "really helpful" to him in that he felt some of them were not being honest or knew more than they were telling. (3 R.R. at 86-89) Officer Widner was unable to develop any leads in the case and no eyewitnesses had come forward, so the case went cold. (3 R.R. at 84-85) Officer Widner was given some names of people who might have information about the case, had a "beef" with the complainant, or might have wanted the complainant dead, but he did not personally interview them. (3 R.R. at 89-96) Appellant was not one of the names included, but the name "Arturo" was given. (3 R.R. at 93-94)

Officer Craft testified that, during his investigation, he found "a couple of rumors or whispers that we had followed up on," but received no "concrete leads to go on at that time." (3 R.R. at 96, 102, 104) Officer Craft testified that Arturo Chavez (Chavez) became a person of interest after speaking with some individuals

2

and also testified that appellant was a known associate of Chavez. (3 R.R. at 107-109) Officer Craft spoke to appellant at some point, but was not able to further his investigation with credible leads or information after speaking with appellant. (3 R.R. at 110) Several names came up during the investigation, but no other credible information arose that was helpful in investigating those individuals while Officer Craft was assigned the case and, by 2005, the case was "essentially cold." (3 R.R. at 110-12)

## II.     Margarita Gonzales's testimony

Margarita Gonzales (Margarita), the complainant's mother, testified that the complainant knew and worked for Chavez, was a cousin to Daniel Torres (Torres), and worked with appellant, whom the complainant had known "for a long time." (3 R.R. at 19-22) The complainant worked for Chavez as a human trafficker, or coyote, but he wanted to get out of that line of work. (3 R.R. at 22-23, *see* 3 R.R. at 117-18) Margarita had a conversation with the complainant a week before his death where she described him as scared and crying. (3 R.R. at 23-24)

## III.    Minerva Gonzales's testimony

Minerva Gonzales (Minerva), who lived near the crime scene, testified that, on November 15, 2004, she was awakened sometime between midnight and 3:00 a.m. by "something like firecrackers," describing "several, like, shots." (3 R.R. at 27-30) She did not hear anything after the shots and did not hear any cars fleeing

3

the scene.  (3 R.R. at 28)  Minerva did not look out her windows to investigate the noises and she did not know if the noise was firecrackers because she "was asleep, but after [she] heard the rest of them, that's when [she] realize[d] that they were shots."  (3 R.R. at 30-31)

## IV.    Daniel Torres's testimony

Torres, a distant cousin of the complainant, also knew appellant and Chavez. (3 R.R. at 146-48)  Torres had known appellant for approximately nineteen years and stated the two were close friends.  (3 R.R. at 148-49, 192)  Appellant introduced Torres to Chavez after Torres was released from prison, about a month before the murder.  (3 R.R. at 149, 191)  Torres was trying to get money for a vehicle, so he "hooked back up with [appellant who] introduced [Torres] to [Chavez]."  (3 R.R. at 151)  Torres testified that appellant was already involved with Chavez in human trafficking and Torres was invited to participate to make some money, which he accepted.  (3 R.R. at 151-52)  Money collected for the operation was given to Chavez and Torres testified both he and appellant reported to Chavez.  (3 R.R. at 153)  Torres described Chavez as 'like a boss . . . he was affiliated with some big people and he was a dangerous person," and stated that appellant was Chavez's right-hand man.  (3 R.R. at 192)

Earlier in the day before the murder, Torres stated he, Chavez, and appellant went to pick up a "green Impala with rims," from someone's home located in "the

4

Lake Houston area." (3 R.R. at 153-54) Torres did not know the person from whom they borrowed the car and stated Chavez was in charge of talking to the person about the car. (3 R.R. at 154-55, 177) After picking up the car, Torres, appellant, and Chavez drove back to a hotel room they used for their trafficking business "sometime in the afternoon," "anywhere from 12:00 to 3:00 . . . ." (3 R.R. at 155-57) Appellant and Torres stayed at the hotel for a while and, eventually, Chavez joined them later. (3 R.R. at 157-58)

When Chavez joined them, Torres testified that Chavez stated he had picked up the complainant and, from what Torres could remember, Chavez said the complainant was "going to snitch about something." (3 R.R. at 158) Torres testified Chavez and the complainant were having "some kind of problems as far as money problems [and he did not] . . . know if [Chavez] didn't pay him all the money that was owed to him or what." (3 R.R. at 158-59) Torres testified there was some sort of falling out between Chavez and the complainant and Chavez did not like the complainant, but he did not know what the problem was or what the complainant was going to snitch about even though they all had trafficking in common. (3 R.R. at 159, 182-83) Torres testified he heard Chavez explain he wanted the complainant "take[n] out," though he did not know what exactly Chavez said to appellant once he pulled appellant aside when he said the complainant "had to be done in—or did in." (3 R.R. at 159, 183)

5

Torres testified that Chavez then went to pick up the complainant and "go drop him off at the park by his grandma's house where he was staying at the time," "because that was the plan." (3 R.R. at 160) Torres testified he was supposed to drive and appellant was "supposed to get off at the park and shoot and kill [the complainant]." (3 R.R. at 160) Torres and appellant left the hotel in the Impala "late, really late" and drove to the park near the complainant's house. (3 R.R. at 161) Torres testified he asked appellant "why he would do some [sic] like that for [Chavez]. . . [a]nd [appellant] told [Torres] that he was just going to talk to him and scare him, that's it." (3 R.R. at 162)

Upon arrival, Torres parked the Impala where he could not see the park and appellant received a phone call after about five to ten minutes, then told Torres, "[h]e's almost here, I'll be right back," and got out of the car. (3 R.R. at 160-61, 163-64) Torres did not see the number of or hear the voice of the person who called appellant, but assumed it was Chavez. (3 R.R. at 184) Torres did not see a weapon in the hotel or during the drive to the park, he did not see appellant with a gun, and appellant did not tell Torres he had a gun before they arrived at the park. (3 R.R. at 164, 183) About five minutes after appellant left the car, Torres heard several gunshots, "about three of them to start off, and then a little pause and then there was another three or four after that." (3 R.R. at 164) About two minutes after the shots, appellant came back to the car, appearing "anxious and nervous at

6

the same time," stating "I got him, I got him, I shot him." (3 R.R. at 165, 192) Appellant told Torres to drive and the two drove to an airport in Baytown, as directed by Chavez, to "meet him there, but he never showed up" so they then drove to Chavez's house. (3 R.R. 165-66) Chavez was home and told them to "go ahead and go to Paco's house" in Beaumont. (3 R.R. at 167)

Once they arrived at Paco's house, Torres and appellant waited for Chavez, who arrived two to three hours later while they waited on the porch. (3 R.R. at 168) Torres testified appellant told Paco what had happened. (3 R.R. at 168) Chavez arrived with his brother, Chuy, with a "little mini welding thing, like a torch." (3 R.R. at 169) Torres testified this was the point where he first saw appellant with a gun "wrapped inside of a sweater in a black trash bag." (3 R.R. at 169) They tried to melt the gun with the torch in a toolshed, but were unsuccessful. (3 R.R. at 169-70) Torres testified that, at that point, "he had told Paco to get rid of the gun. What he did with it, I don't know. I never seen who got the gun after that or who stayed with it" and they left Paco's house. (3 R.R. at 170)

Appellant dropped Torres off in Baytown and Torres testified he saw Chavez either "later on that day or the next day." (3 R.R. at 170) Torres testified he "still continued to stay in contact because [Chavez] kept me around him pretty much [and they] ended up going to Mexico later on," "sometime past November 28th."

7

(3 R.R. at 171-72) Torres went to Mexico with [Chavez] and his family and stated appellant was already in Mexico. (3 R.R. at 173, 187)

Torres was contacted by authorities in 2011, and testified he was not immediately truthful, initially blaming other parties for the murder, but he "started talking" once police told him they had already spoken to appellant, stating he "didn't want to say anything at all because [he] . . . was scared. . . ." (3 R.R. at 173-75, 189-90) Torres stated he told authorities what really happened to the complainant in the same conversation in which he told them other parties were responsible for the murder. (3 R.R. at 196)

Torres testified that, based on rumors, the complainant had more enemies than just Chavez. (3 R.R. at 176, 189-90) Torres was charged with murder in 2012 and agreed to plead guilty to murder and receive a fifteen-year sentence, the minimum sentence considering his felony enhancements, in exchange for his full, truthful testimony. (3 R.R. at 175-76, 188-89) Torres did not know of any "beef or any sort of bad blood between" certain other people in the neighborhood and the complainant, stating those individuals had nothing to do with the complainant's murder. (3 R.R. at 176-77) Torres testified he was involved with the murder, "not by choice," he continued to associate with Chavez after the murder until he "was able to get a ride," and he was scared of Chavez. (3 R.R. at 180, 190-91; *see* 3

8

R.R. at 194) Torres separated from Chavez "no more than six months after" the murder. (3 R.R. at 194-95)

Torres stated it was not unusual to borrow vehicles or for him to be given a car to run errands in the trafficking business and, after the murder, he made trips to get people. (3 R.R. at 178-79, 181) Torres did not know or see what happened in the park or who was at the park. (3 R.R. at 184-85) He did not see the gun during the drive from the park to Beaumont or during any intermediate stops, stating the first time he saw the gun was at Paco's house. (3 R.R. at 185-86) Torres stated he and appellant drove back alone to Torres's house in Baytown. (3 R.R. at 186)

Torres was only charged with murder and the trial court instructed the jury that Torres was an accomplice. (3 R.R. at 196; C.R. at 109-10)

## V.    Francisco Velasquez's testimony

Francisco Velasquez (Paco) knew Chavez, his wife, and appellant. (4 R.R. at 22-23) Paco testified that appellant and Chavez were friends and he did not know if they brought illegal aliens over from the border together, but he was aware that Chavez was involved in human trafficking. (4 R.R. at 24-25) Paco also knew Torres and the complainant. (4 R.R. at 25-26) Paco testified that, on November 13, 2004, he had a birthday party for his daughter at his house, which Chavez attended, and had a closed tent put up. (4 R.R. at 27-28) Paco testified that, the

next day, Chavez called him.[1]  (4 R.R. at 28-32)  Paco later received a phone call from Chavez in the early hours of November 15, 2004, where Chavez said "they had killed [the complainant], and [appellant] and [Torres] were on their way to [Paco's] house."[2]  (4 R.R. at 34-35, 53)

Appellant and Torres showed up at Paco's house in a white truck and, "when they arrived and [Paco] opened the door, they were saying that they had killed [the complainant]."  (4 R.R. at 53-54)  Chavez showed up within hours with his "whole family" and his brother "right behind him."  (4 R.R. at 54-55)  At that point, Paco stated "they went into the tent and Chavez started trying to burn the gun" with something "like a welding torch," but was not successful, while his wife and children stayed in the vehicle.  (4 R.R. at 55-56)  While the gun was being burned, "[t]hey were talking about what had happened with [the complainant], that they had killed him; but [Paco did not] remember very well what they were saying."  (4 R.R. at 56)

Paco testified that a drainage ditch ran behind his house and, after the unsuccessful attempt to burn the gun, "[t]hey took it apart" and "broke it into pieces."  (4 R.R. at 57-58)  Chavez then "threw something in the back and

_____

[1]Paco testified in front of the jury that Chavez was with appellant, the complainant, and Torres, to which appellant made an objection sustained by the trial court and the jury was instructed to disregard the statement.  (4 R.R. at 29-34)

[2]Outside the jury's presence, the court heard a proffer from Paco and addressed appellant's objections to statements Paco heard regarding the murder.  (4 R.R. at 39-52)  The trial court

10

[appellant] and [Torres] took the rest." (4 R.R. at 58) Paco did not go with them when they left and, after the visit to his house, Chavez immediately left for Mexico. (4 R.R. at 58) Paco stated he did not think he saw Torres again or maybe saw him once, and it had been "a long time" since he saw appellant afterwards. (4 R.R. at 59-60) Paco spoke with authorities after Chavez was arrested and was not promised anything or threatened to tell what he knew. (4 R.R. at 61)

Paco testified he "did some favors" for and accompanied Chavez to do things, but that he did not work for Chavez.[3] (4 R.R. at 62-63) He did not recall telling authorities that he worked for Chavez in trafficking. (4 R.R. at 69) Paco was never charged with trafficking but he was concerned about his immigration status. (4 R.R. at 70) Paco stated he had been drinking during his daughter's party and the following day.[4] (4 R.R. at 70-71) He did not recall whether or not he, appellant, and Torres went outside before or after Chavez arrived at his house. (*See* 4 R.R. at 72-73) Paco testified that, although he did not forget what was being discussed, he did not specifically recall who said what. (4 R.R. at 73) Paco testified Chavez took the gun apart and threw a piece behind his house but Paco

---

again sustained appellant's objection to the initial statement that Chavez was with Torres, the complainant, and appellant, but overruled appellant's remaining objections. (4 R.R. at 47-53)

[3]Outside the presence of the jury, regarding his previous statement to authorities that he was involved in trafficking with Chavez, Paco stated he "didn't work for him [but] just helped him do it once or twice." (4 R.R. at 65-67)

[4]While Paco's drinking was discussed in front of the jury, his specific mention of drinking a twelve-pack of beer, addressed in appellant's brief, was made outside the jury's presence and, therefore, is irrelevant in this case. (*See* Appellant's Brief at 20; 4 R.R. at 39, 44, 70-71)

11

did not think he touched the weapon and denied that part of the weapon was left with him to dispose of. (4 R.R. at 74) Paco testified he was told to contact authorities if he was stopped by immigration. (4 R.R. at 76; *see* 4 R.R. at 78)

## VI.   William Navarrete's testimony

William Navarrete testified he loaned a green Impala to Chavez once, which was the only time he had loaned Chavez a vehicle. (3 R.R.at 198-99) Navarrete knew Chavez, but did not know appellant or Torres. (3 R.R. at 197-98) Navarrete testified that, when Chavez came to his house to pick up the vehicle in the evening, he could see two other individuals in the vehicle in which Chavez arrived. (3 R.R. at 200) Navarrete did not know what the car would be used for, testified the car was returned to his driveway when he awoke the next morning for work, and stated he had to go to work at about 5:00 a.m.[5] (3 R.R. at 201, 203)

## VII.   Concepcion Benavides's testimony

Concepcion Chavez Benavides (Benavides), Chavez's ex-wife, testified that appellant worked with Chavez bringing people from Mexico and that, though she "didn't ever see it, [ ] they used to sell drugs or something." (4 R.R. at 79-81) Benavides described appellant and Chavez as "really close friends," stating that appellant was Chavez's right-hand man, and that they were constantly together. (4

---

[5]Although Torres stated the rims shown on photographs of the Impala were different than those on the car at the time of the murder, Navarrete testified the rims were the same. (4 R.R. at 156, 203; State's Exhibits 29, 30)

12

R.R. at 81-82) Benavides also knew Torres and Paco and stated Paco had some involvement in trafficking with Chavez. (4 R.R. at 82) Benavides testified that appellant, Torres, and the complainant "all worked with [Chavez], doing the same thing." (4 R.R. at 83) Benavides testified that Chavez owned some beat-up trucks, some of which were white, that appellant and Torres, and "everyone that worked in the business with him" drove. (4 R.R. at 89-90)

Benavides testified that, on November 15, 2004, she was woken up in the middle of the night by Chavez. (4 R.R. at 84-85) She, Chavez, and her children left and eventually arrived at Paco's house. (4 R.R. at 85-86) Once they arrived, Benavides "sat in the car for a long time . . . and they went somewheres [sic]" where she "couldn't see them anymore." (4 R.R. at 87-88) Benavides remembered appellant was at the house but was not sure if Torres was there. (4 R.R. at 88)

Benavides did not know what was spoken of while she waited in the car. (4 R.R. at 100) No one told her what was going on while she was in the car and no one told her at that time what had happened to the complainant. (4 R.R. at 90) After leaving Paco's house, Chavez told her the complainant was killed and Benavides stated Chavez and appellant "were saying that they did [the complainant] a favor" by killing him. (4 R.R. at 91-92) After leaving Paco's house, they went to a park with "water and a couple of piers and a loading dock."

(4 R.R. at 93; State's Exhibit 28)  Benavides then saw appellant walk "out to the pier that's near the loading dock and he threw something in there."  (4 R.R. at 94)  Benavides testified that, when they left Paco's house with appellant, Chavez, and her children, she did not see a gun, they did not speak about why they were going to the park, and she did not recall if Torres was in the car.  (4 R.R. at 102-103)

Benavides, Chavez, appellant, and Torres ended up in Mexico shortly after the murder and Benavides stated the complainant's murder was brought up many times when appellant was present.  (4 R.R. at 94-97)  Benavides testified she was in the car with appellant, Chavez, and Torres many times, and heard them discuss the murder in front of her "a lot," though the conversations were not directed at her most of the time.  (4 R.R. at 102-103)  Benavides testified there was "absolutely not" any doubt in her mind that Chavez, appellant, and Torres were responsible for the complainant's murder.  (4 R.R. at 97)

Benavides stated it was not normal for Chavez to borrow cars from Navarrete.  (4 R.R. at 97)  Benavides specifically remembered Chavez "saying that they did [the complainant] a favor by killing him, because nobody cared about him. And the only person that he had was his dad, and his dad was dead and now he could be with his dad."  (4 R.R. at 101)  Benavides also "specifically remember[ed] appellant] agreeing with what [Chavez] was saying" when they were discussing the murder.  (4 R.R. at 103-104)

14

## VIII.    Follow-up investigation

BPD Detective Reyes conducted the follow-up investigation and was contacted by Federal Bureau of Investigation (FBI) Agent Coker in 2011.  (4 R.R. at 104-110)  Detective Reyes spoke to Benavides, Navarrete, and Paco, and filed charges on Torres, appellant, and Chavez.   (4 R.R. at 114-15)  Detective Reyes testified that certain other individuals mentioned, discussed earlier at trial, were not "closely associated" with appellant, Torres, or Chavez.  (4 R.R. at 116)  Detective Reyes did not make any promises to or threats against Paco, Navarrete, or Benavides to testify.  (4 R.R. at 116-17)

Detective Reyes testified that if Paco were deported, that could be a possible problem and he would want to know if Paco was detained by immigration because he would want him to be a witness in this case.  (4 R.R. at 117-18)  Detective Reyes testified that Paco was concerned about his immigration status and feared deportation, but he stated that he did not "have the power to make any guarantees or offers to anybody, especially on immigration status," though he discussed immigration consequences with Paco and told him "his cooperation would benefit him."  (4 R.R. at 126-28)  Detective Reyes testified that Paco's wife and children are American citizens.  (4 R.R. at 128-29)

Detective Reyes testified a confidential informant named certain individuals who had a "beef" with the complainant, but he did not speak with any of the named

15

individuals. (4 R.R. at 119-20) Detective Reyes testified that, initially, Torres said someone else was involved in the murder at which time Detective Reyes told him he had spoken with appellant and thought there was more to the story. (4 R.R. at 122-24) The individuals Torres initially blamed were people already listed in the report as "folks that should be spoken to," but Detective Reyes spoke with one of them, as "part of a gang investigation, gang-related" and ruled him out as a suspect in this case. (4 R.R. at 124-25, 128-29)

FBI Agent Coker opened his investigation in May 2011 and began working with Detective Reyes around December 2011, participating in several of the witness interviews. (4 R.R. at 129-34, 137-38) Agent Coker made Torres and Paco no deals or promises and confirmed that the decision to file charges was not based on Paco's statements. (4 R.R. at 134-36) Agent Coker told Paco, "and his wife that if he were detained by Immigration to give me a call or Detective Reyes. . . . just to make sure he didn't get deported until we were able to get his testimony." (4 R.R. at 136) Paco told Agent Coker he "had been involved in human trafficking to some degree" but Agent Coker did not "have any information that he was involved more heavily than that" or have any corroborating information. (4 R.R. at 136-37) Agent Coker was investigating Chavez for crimes other than human trafficking, and he did not file trafficking charges on Chavez, appellant, Paco, or Torres. (4 R.R. at 137-39)

No DNA was recovered from the spent shell casings to compare to the complainant's DNA profile. (3 R.R. at 139-45; State's Exhibit 40) A gunshot residue (GSR) test of the complainant's hands showed one GSR particle on his right hand and no GSR particles on his left hand. (3 R.R. at 119, 124-25, 127-33; State's Exhibit 39) The GSR test was deemed inconclusive due to the low number of particles found and the complainant's clothing was not tested. (3 R.R. at 134-35, 137) Officer White testified that, in April 2012, he helped coordinate an underwater search in the Neches River and the drainage ditch behind Paco's house, yet no gun or evidence connected to the case was recovered. (3 R.R. at 69, 71, 73-76; State's Exhibit 27; *see* 4 R.R. at 57)

The jury was instructed that it could find appellant guilty of murder either as a principal actor or under the law of parties. (C.R. at 107-108)

## SUMMARY OF THE ARGUMENT

The non-accomplice evidence presented—including evidence of appellant's connection with Chavez, his arrival with Torres at Paco's home, statements he made or participated in regarding the murder, his presence during the gun's destruction along with his actions shortly after leaving Paco's home, and his subsequent flight to Mexico—tended to connect appellant with the complainant's murder. Therefore, this non-accomplice evidence sufficiently corroborated Torres's accomplice witness testimony presented at trial.

17

Additionally, the totality of the evidence presented—including evidence of Chavez's falling out with the complainant, appellant's relationship with Chavez, Torres's testimony regarding appellant's actions and statements during the time the murder occurred, appellant being seen with a gun at Paco's house, appellant's presence during the gun's destruction, and his conversations and actions after the murder—is sufficient to uphold his murder conviction, either as a party to the offense or as the principal actor.

## RESPONSE TO APPELLANT'S THIRD POINT OF ERROR[8]

In his third point of error, appellant argues that the non-accomplice evidence presented at trial was insufficient to tend to connect appellant to the offense. (Appellant's Brief at 19, 21)

### I.    Corroboration of accomplice witness testimony

The Texas Code of Criminal Procedure dictates a conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2015).   To determine if accomplice testimony is sufficiently corroborated, appellate courts "eliminate from consideration the

accomplice testimony and then examine the other inculpatory evidence to ascertain whether the remaining evidence tends to connect the defendant with the offense." *McDuff v. State*, 939 S.W.2d 607, 612 (Tex. Crim. App. 1997).

"[N]on-accomplice evidence does not have to directly link [a defendant] to the crime, nor does it alone have to establish his guilt beyond a reasonable doubt; but rather, the non-accomplice evidence merely has to tend to connect [the defendant] to the offense." *Id.* at 613; *see also Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996) ("[n]o precise rule can be formulated as to the amount of evidence required to corroborate"); *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994). "The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense [and] when there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—[appellate courts] will defer to the factfinder's resolution of the evidence." *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011).

In light of this standard, the Court of Criminal Appeals has stated "it is not appropriate for appellate courts to independently construe the non-accomplice

---

[8]Because the State's reply to appellant's first and second points of error is predicated upon the response to appellant's third point of error, the State will initially address appellant's third point of error.

evidence." *Id.* Appellate courts must "consider the combined force of all the non-accomplice evidence that tends to connect the accused to the offense." *Id.*

"[A]n accomplice's testimony cannot be corroborated by prior statements made by the accomplice witness to a third person." *Id.* at 439. Additionally, appellate courts "may not consider the testimony of one accomplice witness as corroboration of the testimony of another accomplice, nor may [they] view the testimony of a third party about an accomplice's prior consistent statements as corroboration of the accomplice's testimony." *Crawford v. State*, 863 S.W.2d 152, 157 (Tex. App.—Houston [1st Dist.] 1993, *rev'd on other grounds*, 892 S.W.2d 1 (Tex. Crim. App. 1994) (citing *Aston v. State*, 656 S.W.2d 453, 454 (Tex. Crim. App. 1983); *Reynolds v. State*, 489 S.W.2d 866, 872 (Tex. Crim. App. 1972)).

However, the Court of Criminal Appeals has declared that "testimony" requiring corroboration under Article 38.14, "is that which is adduced 'through live witnesses speaking under oath or affirmation in presence of tribunal [.]'" *Bingham v. State*, 913 S.W.2d 208, 210 (Tex. Crim. App. 1995) (op. on reh'g) (quoting *Black's Law Dictionary*, (6th ed. 1990), at 1476). Therefore, a non-testifying accomplice's out-of-court statements do not require corroboration under Article 38.14 in order to be considered by a jury. *See Bingham*, 913 S.W.2d at 213; *Nguyen v. State*, 177 S.W.3d 659, 669 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (finding no basis for defendant's request for an accomplice jury instruction

20

regarding individuals who did not testify at trial, stating "the accomplice rule applies only to testimony adduced in open court by live witnesses").

While a defendant's mere presence with an accomplice "before, during, and after the commission of the offense is insufficient by itself to corroborate accomplice testimony, evidence of such presence, coupled with other suspicious circumstances, may tend to connect the accused to the offense." *Dowthitt*, 931 S.W.2d at 249. "Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration." *Id.*

## II. The non-accomplice evidence presented at trial corroborates Torres's accomplice witness testimony.

The jury was instructed that Torres was an accomplice. (C.R. at 109-10) However, upon exclusion of Torres's testimony from consideration, the non-accomplice evidence presented amply connected appellant to the complainant's murder. A rational jury could have found from the non-testimonial evidence presented that: 1) the complainant worked for Chavez in an illegal business and wanted to get out of that line of work, 2) appellant was Chavez's friend and right-hand man, 3) Chavez was developed as a person of interest during the case investigation, 4) other individuals were present with Chavez when he borrowed the Impala from Navarrete, 4) appellant arrived together with Torres at Paco's house, 5) a gun was used to kill the complainant, 6) appellant was present when Chavez

21

tried to destroy a gun after the murder occurred, 7) the same gun was broken into pieces—some of which were given to appellant and Torres—and appellant was later seen throwing something into the Neches River after leaving Paco's house, 8) appellant left for Mexico soon after the murder, 9) appellant, while with Torres, made statements about killing the complainant, and 10) appellant was present for and participated in discussions with Chavez regarding the complainant's murder. (*See* 3 R.R. at 22-24, 71, 84, 107-109, 198-200; 4 R.R. at 6, 9-10, 16-20, 24, 35, 53-58, 73, 81-83, 87-88, 91-97, 101-104; State's Exhibits 28, 31) Notably, Chavez did not testify during trial and his out-of-court statements do not qualify as "testimony" requiring corroboration under Article 38.14 to be considered by the jury. *See Bingham*, 913 S.W.2d at 213; *Nguyen*, 177 S.W.3d at 669.

The totality of the non-accomplice evidence presented at trial more than amply tends to connect appellant with the complainant's murder. Although appellant refers only to a few conversations overheard by Paco and Benavides regarding this point of error, the non-accomplice evidence presented in this case is much more expansive and inculpatory of appellant.[9] (*See* Appellant's Brief at 20-21) In fact, the non-accomplice evidence regarding appellant's actions after the

---

[9]While appellant seems to characterize the conversations discussed as inadmissible hearsay, appellant ignores the fact that evidence of several of the conversations was admitted at trial, either without objection or over appellant's objections. (*See* 4 R.R. at 39-56, 101-104; Appellant's Brief at 20-21) Furthermore, even if this evidence was improperly admitted, appellate review of evidence for a sufficiency analysis includes evidence both properly and improperly admitted. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

murder is just as telling as the evidence regarding his close relationship with Chavez, his statements, and the conversations in which he was a party. *See Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) ("Evidence of flight evinces a consciousness of guilt"); *Miller v. State*, 177 S.W.3d 177, 184 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (noting defendant's "flight immediately after the shooting and his attempts to hide evidence constitute circumstantial evidence of his guilt"); *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.) ("'[a] 'consciousness of guilt' is perhaps one of the strongest kinds of evidence of guilt [and i]t is consequently a well accepted principle that any conduct on the part of a person accused of a crime subsequent to its commission, which indicates a 'consciousness of guilt' may be received as a circumstance tending to prove that he committed the act with which he is charged.'") (quoting Ray, Texas Practice Vol. 2, *Law of Evidence*, §1538, at 242 (1980)).

This evidence does not have to be sufficient in itself to find appellant guilty of murder beyond a reasonable doubt, nor must it directly connect him to the murder. *McDuff*, 939 S.W.2d at 613. However, upon review of the evidence with "proper deference to the jury's fact resolution," a rational factfinder could have easily, and reasonably, found that the evidence of appellant's presence with Torres and Chavez immediately following the murder, appellant's relationship with

Chavez, and the additional suspicious circumstances regarding appellant's actions and conversations surrounding the murder tended to connect him with the crime. *Smith*, 332 S.W.3d at 442.

Therefore, because a rational factfinder could have found that the non-accomplice evidence presented at trial sufficiently tended to connect appellant to the complainant's murder, this Court should overrule appellant's third point of error and find Torres's accomplice witness testimony was sufficiently corroborated.

## RESPONSE TO APPELLANT'S FIRST AND SECOND POINTS OF ERROR[10]

In his first and second points of error, appellant contends the evidence is insufficient to support his conviction for murder as a principal actor or under the law of parties, respectfully. (Appellant's Brief at 8, 9, 14, 18)

### I. Standard of review

The *Jackson v. Virginia* legal-sufficiency standard is the only standard applied to appellate evaluation as to whether evidence is sufficient to support an offense's elements. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Evidence is legally sufficient if, upon review of all of the evidence in a light most favorable to the verdict, "any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Jackson*, 443 U.S. 307, 319 (1979)).

The factfinder's verdict "must stand unless it is found to be irrational or unsupported by . . . the evidence . . . ." *Matson v. State*, 819 S.W.2d 839, 843 (Tex. Crim. App. 1991) (quoting *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988)). Under this deferential standard of review, circumstantial evidence "is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). A jury "as the sole judge of the credibility of witnesses and the weight to be given to their testimony," is permitted to believe or disbelieve testimony. *Noland v. State*, 264 S.W.3d 144, 149 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (citing *Cain v. State*, 958 S.W.2d 404, 408-409 (Tex. Crim. App. 1997); *Robles v. State*, 104 S.W.3d 649, 652 (Tex. App.—Houston [1st Dist.] 2003, no pet.)).

"[I]n analyzing legal sufficiency, [appellate courts] 'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 16-17). Furthermore, appellate "review of 'all of the evidence' includes evidence that was properly and

---

[10]Because much of the supporting facts and authorities apply to the State's response to

improperly admitted [and w]hen the record supports conflicting inferences, [appellate courts] presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination." *Id.* (citing *Connor v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001); *Jackson*, 443 U.S. 326).

Where the trial court's charge authorizes a jury to find a defendant guilty of an offense under alternative theories, "the verdict of guilt will be upheld if the evidence was sufficient on any one of the theories." *Sorto v. State*, 173 S.W.3d 469, 472 (Tex. Crim. App. 2005).

## II.   Sufficiency of evidence regarding the law of parties

"In reviewing the sufficiency of the evidence, [appellate courts] should look at 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985); *Thompson v. State*, 697 S.W.2d 413, 416 (Tex. Crim. App. 1985)). "Each fact need not point directly and independently to the guilt of the [defendant], as long as the cumulative effect of all the incriminating facts are sufficient to support the conviction." *Id.*

appellant's first and second points of error, the State will address these points together.

**III. The evidence presented is sufficient to uphold appellant's murder conviction as the principal actor or as a party to the offense.**

Considering the totality of the evidence in a light most favorable to the verdict, a rational factfinder could have found appellant guilty of murder as a party to the offense or as the shooter himself beyond a reasonable doubt.

In addition to the non-accomplice testimony presented at trial, (discussed above in State's Reply to Appellant's Third Point of Error), the jury also heard from Torres regarding the murder. Torres specifically testified that: 1) Chavez and the complainant had a falling out, 2) Chavez wanted the complainant "taken out," 3) appellant was supposed to shoot and kill the complainant, 4) he and appellant went with Chavez to borrow the Impala, 5) Torres drove appellant to the park near the complainant's home, 6) appellant received a phone call, stated "he's almost here" and left the vehicle, 7) shortly after appellant left the vehicle Torres heard multiple gunshots, after which appellant got back in the vehicle and stated "I got him, I got him, I shot him," 8) Torres saw appellant with a gun once they arrived at Paco's house, 9) appellant told Paco what happened upon their arrival, and 10) appellant went to Mexico soon after the murder. (3 R.R. at 153-54, 158-61, 163-65, 168-69, 173, 182-83, 187, 192) Torres also told the jury about his plea bargain agreement with the State for his role in the murder. (3 R.R. at 175-76, 188-89)

As the jury was free to believe or disbelieve Torres's testimony, a rational factfinder could have found appellant guilty of murder under the law of parties

27

after viewing the evidence in a light most favorable to the verdict. At the very least, the jury could have reasonably found appellant: 1) was present for the murder, 2) assisted in disposing of the murder weapon immediately afterwards, 3) was aware of what had happened to the complainant, continually discussing it with multiple parties, and 4) subsequently fled the country. Such evidence is sufficient to uphold appellant's murder conviction under the law of parties, as it demonstrates his intent, as well as his assistance in the commission of the offense.

While the evidence is sufficient to support appellant's conviction under the law of parties, the evidence is even stronger in support of appellant's conviction for murder as the principal actor himself. Based on the totality of evidence viewed in a light most favorable to the verdict, a rational factfinder could have found that appellant was the actual shooter, given evidence of: 1) Chavez's orders, 2) appellant's location and actions at the time of the murder, 3) his possession of the gun at Paco's house, 4) his inculpatory statements, including his statement of "I got him, I got him, I shot him" to Torres, 5) his participation in destroying the gun, and 6) his subsequent flight to Mexico. While the evidence of appellant's actions prior to and during the murder supports a reasonable inference of his guilt, so too, does the evidence regarding his statements and behavior after the murder. *See Clay*, 240 S.W.3d at 905 n.11; *Miller*, 177 S.W.3d at 184.

Therefore, because the totality of the evidence presented is sufficient to support appellant's murder conviction, either as a principal actor or under the law of parties, this Court should overrule appellant's first and second points of error.

## <u>CONCLUSION</u>

It is respectfully submitted that all things are regular and the conviction should be affirmed.

**DEVON ANDERSON**
District Attorney
Harris County, Texas

/s/ Patricia McLean
**PATRICIA MCLEAN**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 755-5826
TBC No. 24081687
mclean_patricia@dao.hctx.net

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing instrument has been sent to the

following email address via e-filing:

Vivian King
Attorney for Appellant
VivianRKing@msn.com

/s/ Patricia McLean
**PATRICIA MCLEAN**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 755-5826
TBC No. 24081687


## CERTIFICATE OF COMPLIANCE

The undersigned attorney certifies that this computer-generated document has a word count of 7,098 words, based upon the representation provided by the word processing program that was used to create the document.

/s/ Patricia McLean
**PATRICIA MCLEAN**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 755-5826
TBC No. 24081687

Date: 10/14/2015